**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

ESTATE OF JAMES RUSH,

     Plaintiff,

v.

HON. BOBBY HADDOCK, et al.,

     Defendant.

CASE NO. 5:10-cv-152-RS

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, JACQUELINE FINN, Personal Representative of the ESTATE OF JAMES RUSH, by and through the undersigned attorney, responds to Defendants' Motion for Summary Judgment, and would show as follows:

James Rush, Plaintiff's decedent, died of a cardiac event brought on by oxygen starvation (anoxia). He had appealed to Defendants for help through repeated 911 calls, stating he was desperate and was afraid he would be found dead on the floor of his home. Deputies went to his home but failed to investigate the cause of his distress. Later that morning he was arrested for misuse of 911, which arrest was changed to a "Marchman Act" commitment, a temporary civil commitment on a suspicion of self-endangerment by substance abuse. Defendant Sheriff provided no particular training to dispatchers and deputies in how to do wellness checks and no medical staff was

1

available at the jail to evaluate the decedent. Decedent had no access to his oxygen during his transport to the jail. The booking area was deserted for a critical time when the decedent unsuccessfully tried to summon jail staff and then collapsed and died. Medical staff arrived too late to restore a heartbeat through CPR or the Automated External Defibrillator (AED).

Defendants argue as follows:

A. Plaintiff has not established liability in the individual officers.

B. Absent individual liability, there can be no official liability.

C. Plaintiff cannot establish that the Sheriff was personally involved, ignored widespread abuses, or deliberately indifferent to risk.

D. Plaintiff has not established liability except as to simple negligence.

E. The Court should decline to exercises supplemental jurisdiction.

MEMORANDUM OF LAW

A. **Liability of Jonathan Rackard and Frank Stone**

The individual officers, Dep. Jonathan Rackard and Dep. Frank Stone, were deliberately indifferent to the serious medical needs of James Rush. The officers had notice of his medical condition both in his words and in his evident physical condition. Mr. Rush's confusion was palpable in his conversations with Rackard.

Dep. Rackard was on notice that Mr. Rush had a serious medical condition. Mr. Rush told him he had a medical appointment in the morning. He said that he was afraid

2

he'd be found on the floor. Dep. Rackard stated that he made two visits to Mr. Rush's home and spent a total of 37 minutes there but said he never entered the room. He claimed not to have seen oxygen tanks. He did not smell alcohol although he saw a glass of beer and two empty containers. He said Mr. Rush's speech was not slurred. He was not staggering. Dep. Rackard did not recall telling Dep. Stone that Mr. Rush was intoxicated but only that he had been drinking.

At the time of his actual arrest by Dep. Stone and Dep. Gary Smith, a video camera in Stone's patrol car shows Mr. Rush sitting low on his couch and visibly gasping for air.[1] Oxygen tanks were in the room and were noticed by Dep. Stone but he made no effort to place the breathing apparatus on Mr. Rush who appeared feeble and confused. Dep. Stone stated that he had no discretion not to arrest Mr. Rush because his "commanding officer," Dep. Rackard, ordered that Rush be arrested.

The Defendant Officers fault Plaintiff's decedent, for not telling them clearly that he needed access to his oxygen and that he needed to go to the hospital. They say he didn't seem to be out of breath as he moved around. However that claim is clearly contradicted by Dep. Stone's in-car video of Mr. Rush gasping for breath on his couch.

At about 1:17 a.m. on January 23, 2008, Dep. Rackard went to the home to do a welfare check on Mr. Rush at his request. Dep. Rackard did not go inside. He stood at the door, 10-12 feet away from Mr. Rush and did not go inside. He did not smell

---

[1] Dep. Stone zooms the in-car camera in on Mr. Rush through the open door so that it is possible to see with great clarity every labored breath that he takes, and the frailty he displays as his is physically supported by the two officers on the trip to the car.

alcohol. He saw a full glass of beer and a couple empty containers.

Mr. Rush told Dep. Rackard that he had a doctor's appointment in the morning and that someone would be coming to pick him up. Rackard did not say that he made any inquiry about the reason for the medical visit. Dep. Rackard said Mr. Rush expressed a fear of ending up on the floor. He did not recall if the dispatcher told him about Mr. Rush's concern about being found dead.

Dep. Rackard said he returned to the home at 4:20 a.m. and left at 4:32 a.m. Again, he didn't enter the home but stood in the doorway. He said he warned Mr. Rush about calling 911 and the possibility he could go to jail. Dep. Rackard would have known that Mr. Rush was confused and there is ample evidence that there was an emergency. There was substantial evidence that Plaintiff's decedent was reaching out for help as a result of an urgent fear of impending death and that because of his confusion and basically unassuming nature, he was unable to confront the subject directly. At different times, though, he said he was desperate and feared being found on the floor dead the next morning, and showed great nervousness. As such, there was an emergent reason for his calls which obviates probable cause.

Decedent's alcohol level at the time of his death – .023 – was consistent with his having one or two beers in the preceding hours. Family members say Mr. Rush was not a heavy drinker. The medical examiner said the low alcohol level would have been a true picture of his blood alcohol level at his arrest and death 90 minutes later since his body

was refrigerated immediately after death. (Deposition of Cameron Snider).

Arresting officers noted evidence that Mr. Rush needed oxygen but threw the oxygen tank in the trunk rather than keeping it with Mr. Rush in the back seat. By the time he got to the jail he was complaining about his inability to breathe.

A sheriff's in-car video recording that was not disclosed until very late in this litigation, Mr. Rush is seen in his living room sitting low on his couch and visibly gasping for breath just prior to being taken to the patrol car. At some point, Dep. Stone is seen pulling him from the couch and letting to of him just out of sight, presumably on the floor. In a few minutes he comes back and pulls Mr. Rush back onto the couch. The audio track is missing from the video clip. Dep. Stone said his microphone was broken and that he had previously known it was broken but had not gotten it fixed. As Mr. Rush is led from his apartment, it is clear on the video how weak he is.

A factfinder may conclude that an officer knew of a substantial risk from the very fact that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994).

B. **Qualified Immunity**.

Once it is established that a law enforcement officer is acting within his discretionary authority when the alleged violation of civil rights occurred, the burden shifts to the plaintiff to show that the conduct violated a constitutional right. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

5

There is ample evidence that Plaintiff's decedent needed the care Plaintiff claims was denied. Dr. Dragovic, Plaintiff's expert, testified that, in his expert opinion, Mr. Rush died of a cardiac event brought on by anoxia. This corresponds with a denial of oxygen by Defendants during his trip to the jail. This evidence is certainly enough to allow the jury to conclude that Mr. Rush needed care that was denied.

The Defendants simply deny that they were on notice that Mr. Rush needed access to his oxygen or any kind of specialized care. They do not claim that they provided the needed care. Evidence exists that would allow a jury to conclude that the defendants knew of these needs. The in-car video shows Mr. Rush gasping for breath in his home just before he is to be taken to the jail. A jury could infer that this constitutes deliberate indifference to Mr. Rush's health needs.

Plaintiff has produced adequate proof to allow a reasonable jury to conclude that Mr. Rush had serious medical needs, and that the defendants knew of those needs. Whether the defendants acted with deliberate indifference to Mr. Rush's needs is a question of fact for the jury. Thus, the Defendants Rackard and Stone are not entitled to qualified immunity.

A. **Official vs. Individual Liability**.

There is a strong basis for individual liability in this case but even if there were not, there are circumstances in which an official capacity defendant could be liable where his subordinates were not liable. Official capacity defendants could have a basis

6

for liability in their greater duty to train and supervise and in a greater store of information giving rise to deliberate indifference. As the Eleventh Circuit held in *Anderson v. City of Atlanta*, even where a jury found no liability in the individual officers, local government could still be found liable. The court stated:

> [t]he language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." Monell, 436 U.S. at 692 [98 S.Ct. at 2036]. Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985), *quoting Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir.1985) (*quoting Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). *Monell* and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government. *Id.*

B. **Sheriff's liability**.

Sheriff Haddock is sued in both his personal and official capacity. In his personal capacity, his liability depends on what he knew and did personally. In his official capacity, his liability is in the nature of municipal liability. The Supreme Court held in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that a municipality cannot be subjected to § 1983 liability "based upon theories akin to *respondeat superior*." *Tuttle, supra*, 105 S.Ct. at 2433. Thus, only deprivations arising from municipal custom or policy can result in municipal liability. *Id.*; see also *Monell v. New*

*York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978);
*Gilmere v. City of Atlanta*, 774 F.2d 1495, 1503 (11th Cir.1985) (en banc). When an injury
is inflicted as the result of governmental policy or custom, the government is
responsible under § 1983. *Monell, supra*, 436 U.S. at 694, 98 S.Ct. at 2037. *Anderson v. City
of Atlanta*, 778 F.2d 678, 685 (11th Cir. 1985).

Plaintiff does not argue that the policies that proximately caused the death of
James Rush were those of the officers, Defendants Rackard and Stone, or that they
were part of a pattern of widespread abuse that resulted in the deaths of other inmates.
Plaintiff argues that the policies of the Washington County Sheriff and in effect at the
Washington County Jail were substantially certain, sooner or later, to result in the death
of a vulnerable adult such as Mr. Rush.

The Sheriff had a policy of doing "welfare checks" on persons who were
apparently in distress and the initial visits to Mr. Rush was such a welfare check. There
was no training for persons who did welfare checks on issues like medical conditions
that can cause distress. Neither was there particular training for a dispatcher, like
Jennifer Cate, to recognize the desperation of her repeat 911 caller.

Defendant Rackard never entered the home and did not look for causes of
distress and was not trained to do so. The jail was contacted and a wheelchair was
requested. The officer was told none were available. Medical staff came on duty at the
same time Mr. Rush arrived at the jail but was not requested to be present. There was

8

no policy or training to make these things available. There was virtually no staff on duty in the booking area when Mr. Rush was brought in. There was no permanent designated booking officer and the job was handled by whoever was available. At some point, a few minutes before his collapse, he is seen on video tape walking slowly up to the holding cell door, trying to attract someone's attention.

This is not a case like *Davis v. DeKalb County School Dist.*, 233 F.3d 1367 (11th Cir. Ct. App. 2000), in which the policymaker investigated claims of wrongdoing by a teacher accused of sexual abuse and despite his conclusion that the claims were unfounded, made efforts to monitor the teacher.

### 1.  Liability does not depend on a showing of multiple jail deaths

It is not necessary to the liability of the Washington County Sheriff to show that a pattern of deaths resulted from understaffing and lack of training at the Washington County Sheriff's Office and at the Washington County Jail. The understaffing and lack of training which was the proximate cause of the death of Mr. Rush was not in itself an isolated incident. *See Anderson, supra*, at 685-86 (understaffing at jail was not an isolated incident but a persistent problem).

As Defendants conflate personal with official liability, they also conflate two kinds of causal links between a policymaker's acts or omissions and an injury. They conflate the requirement of showing widespread abuse with a showing that the policymaker maintained standing policies that made the injury substantially certain to

9

occur. Defendants admit that there was no policy to take persons in Mr. Rush's condition to the hospital rather than to jail. However there were no provisions in place for persons showing serious health problems to get adequate treatment at the jail. And there was no one there to evaluate or monitor Mr. Rush.

To give the intended meaning to *Depew*, it is true that "[n]ormally random acts or isolated incidents are insufficient to establish a custom or policy. *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986) *citing Bennett v. City of Slidell*, 728 F.2d 762, on rehearing, 735 F.2d 861 (5th Cir.1984) (en banc). However the minority of situations is that discussed in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S. Ct. 2427, 2435, 85 L. Ed. 2d 791 (1985), where Justice Rehnquist wrote that *Monell 's* "policy or custom" requirement "was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers.*" City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S. Ct. 2427, 2435, 85 L. Ed. 2d 791 (1985). In other words, "one bad apple" in a law enforcement agency would not be sufficient to impose liability. *Id.*

In *Monell*, the Court held that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037-38 (emphasis added). In *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), a

plurality of the Court held that "a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Id.* at 823-824, 105 S.Ct. at 2436 (emphasis added). In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court held that municipal liability *may* be imposed for a single decision made by a municipal policymaker.

The policies of the Sheriff here are like those in *Monell* compelling pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons. As Rehnquist notes in *City of Oklahoma*, "this policy *in and of itself* violated the constitutional rights of pregnant employees by reason of our decision in *Cleveland Board of Education v. LaFleur*, [citation omitted]." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822, 105 S. Ct. 2427, 2435, 85 L. Ed. 2d 791 (1985). In such a case, there is no requirement to show repeated injuries by reason of the policy application.

### 2. Inadequate training

Sheriff Haddock had a policy that his dispatcher would take 911 emergency calls but did not offer the dispatcher training to discern the kind of medical problems that might attend confusion in an elderly caller that gave rise to his distress. The Sheriff had a policy that patrol officers would undertake to conduct welfare checks but did not provide the officers with training to discern medical problems once they made contact

11

with the subject of the check. Defendant Sheriff had a policy to take persons in decedent's position to jail, either as an arrest or a civil commitment, but did not provide the training to determine whether the person would go to the jail or the hospital. Nor was there a trained booking officer on duty in the booking area with the training to make that call when Mr. Rush arrived there. The Sheriff offered no such training and there was no testimony that the training was offered by the Training Academy.

Here, the policies are those of the Sheriff himself and not of errant deputies.[2] It was not a distortion of the Sheriff's policy for the agency to undertake welfare checks without particular training in assessing situations that give rise to distress in elderly and vulnerable adults. The Sheriff, through his Jail Administrator, not a freelancing corrections officer, created the "musical chairs" system for the jail booking officer that left the position empty when Mr. Rush was at the cell door trying to get help and for the time it took for him to collapse and die on the cell floor.

Where failure to train is alleged by a § 1983 plaintiff, municipal liability will be found only if a constitutional violation is part of a pattern of misconduct or where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur. *Denning v. Metropolitan*

---

[2] Defendant Haddock had good reason to be concerned about repeated incidents involving Deputy Jonathan Rackard, whose actions as recounted in *Powell v. Haddock* and *Buckley v. Haddock*, before this Court, violated an arrestee's civil rights (Defendant Haddock apparently refers to *Buckley* as *Beasley* and claims the Eleventh Circuit found no constitutional violation. (Haddock MSJ, p.6, n.1). In fact, a majority of the panel said there was, but a different majority found qualified immunity.)

*Government of Nashville*, 564 F.Supp.2d 805 (M.D. TN 2008).

Clearly, a policymaker, to be held liable for deliberate indifference, must have notice of facts that give rise to an inference of a risk of serious harm. That notice may be frequent wrongdoing by his officers or it may be instituting or failing to institute a policy or a failure to train that makes an injury substantially certain to occur.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), a detainee brought a civil rights action for a failure to provide her with necessary medical attention while she was in custody. The U.S. Supreme Court held that inadequacy of police training may serve as basis for § 1983 municipal liability where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact. *Id.* at 389. Such liability may occur where,

> "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.10 In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989). The Court made an analogy to the use of deadly force. City policymakers know that officers will be required to arrest fleeing felons and has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so

obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 400, 109 S. Ct. 1197, 1211, 103 L. Ed. 2d 412 (1989).

Here, as in *Canton v. Harris*, officers had basic first responder training, including First Aid. As in *Canton v. Harris*, the question should be for a jury whether this was sufficient for conducting welfare checks and taking into custody, either for arrest or commitment, elderly and frail persons apparently suffering from some sort of impairment. As the Supreme Court said in Canton v. Harris:

> Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 391, 109 S. Ct. 1197, 1206, (1989)

### 3. Inadequate staffing

There was virtually no staff on duty in the booking area when Mr. Rush was brought in. There was no permanent designated booking officer and the job was handled by whoever was available. A few minutes before his collapse, Mr. Rush is seen on video tape walking slowly up to the holding cell door, trying to attract someone's attention. The video shows that the booking area is deserted. A few minutes later, he collapses on the floor and is found without a heartbeat or pulse. There was testimony

that there was no medical staff called out to evaluate Mr. Rush and no booking officer on duty to screen him or to monitor him as he waited in his holding cell.

*Anderson v. City of Atlanta, supra,* was a case in which an arrestee took a large number of pills prior to entering the pretrial detention center. The booking officer was put on notice of this during the initial screening. The arrestee, Anderson, died in a holding cell sometime during the night and was found dead in his cell the next morning. Detention center officers testified they were hampered in their ability to monitor prisoners because the facility was inadequately staffed. The officer on duty testified he was alone that night because another officer assigned to receiving "was off doing someone else's job." *Anderson* at 682. He testified that there was no medical staff present on that shift, *Id.*, and that because of the shortage of staff, it was impossible to check on inmates as often as needed. *Id.* at 683.

Mr. Rush had a clearly-established right to medical care. Plaintiff maintains the facts demonstrate he was denied that right. But for the denial of that right, he would not have died. The acts and omissions were the moving facts behind his injury and death. Plaintiff does not maintain a small rural county jail must institute all the facilities of a modern hospital just because it is likely to receive frail and elderly persons into its care. But it must provide the minimal training necessary for its staff to know it must divert some arrestees to the hospital, which in this case was only a short distance away.

Defendants argue that law enforcement officers and jail staff are not

policymakers for the Sheriff. But our argument is that the Sheriff did not formulate policy or implement training to guide them. There is an argument that formation of policy or failure to promulgate a certain policy is a discretionary activity that does not give rise to liability in government actors but there are cases that say that where the need for a policy is clear, failure to promulgate a policy can lead to liability.

It is clear that these were the procedures on which the jail operated. Question for the finder of fact. The Court cannot find as a matter of law that they were not the proximate cause of Mr. Rush's injury and death.

Defendants almost have it right on a number of issues but where they miss, the miss is meaningful. For instance, where Defendant Haddock says, "*There can be no imposition of liability* based upon an isolated incident," citing *Depew v. City of St. Mary's*, 787 F.2d 1496 (11th Cir. 1986). What *Depew* actually says is that *generally* there can be no liability. "There can be no liability" is not the functional equivalent of "Generally there can be no liability" because the latter statement admits to exceptions whereas the former does not. Counsel for Defendants is, of course, aware of this.

At this point, Sheriff Bobby Haddock has had ample opportunity to see Jonathan Rackard's capacity for violating the civil rights of the persons with whom he comes in contact. In *Buckley v. Haddock*, 5:06-cv-53-RS/MD, Rackard used a Taser in drive-stun mode on a passively resisting arrestee. Although the Eleventh Circuit granted Rackard qualified immunity, two of the panel of three found that Rackard had

16

violated Buckley's constitutional rights. *Buckley v. Haddock* 292 Fed.Appx. 791 (2008). In *Powell v. Haddock*, Jonathan Rackard was found to have violated constitutional rights and not entitled to qualified immunity. 366 Fed.Appx. 29 (2010).

### 4. Proximate cause

Plaintiff's expert, Dr. Dragovic, states that Mr. Rush died of a cardiac event brought on by oxygen starvation or "anoxia." The Medical Examiner, Dr. Cameron Snider, stated there was a "diffuse edema" in the brain caused by a lack of oxygen to the brain. Plaintiff's expert agreed oxygen starvation was the critical factor in the death. Mr. Rush stated as he was led from the car that he was short of breath.

Defendants' expert claimed a "diffuse edema" did not necessarily mean oxygen starvation where there had been vigorous efforts to resuscitate a decedent. Though the expert did not explain, an inference could be drawn that he meant an edema could be caused by head trauma resulting from the resuscitation process. Medical Examiner Snider made clear there was no evidence of trauma to the head.

The Medical Examiner testified that stress would have aggravated Mr. Rush's condition and his need for oxygen. The Deputies had placed Mr. Rush's oxygen in the trunk of the patrol car, out of his reach. The Deputies had no particular medical training, other than CPR and First Aid. The Deputies did not take Mr. Rush to a hospital or call medical staff to meet them at the jail.

### C. ADA and Rehabilitation Act Counts (Counts II and III)

17

Defendants claim that Plaintiff fails to state a case under the Americans with Disabilities Act or the closely similar Rehabilitation Act. Defendants err in each area cited in the Motion for Summary Judgment.

### 1. James Rush was a qualified person with a disability

As alleged in the complaint, James Rush was a frail elderly vulnerable adult. A "Disability" for purposes of the ADA is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). He suffered from COPD and required access to oxygen. Oxygen starvation prevented him from understanding and advocating for his own medical treatment.

### 2. James Rush was denied benefits of services, programs, or activities

James Rush was deprived of the safe care and custody of the Washington County Sheriff's Office and Washington County Jail. At the time of his arrest, he was suffering confusion as a result of oxygen starvation which affected his ability to think and advocate for his own health care. Had he been provided with access to oxygen or been delivered to a medical facility, he could have been able to receive the same safe custody that other inmates received.

### 3. James Rush was subject to discrimination

Plaintiff adequately shows the discrimination against decedent was intentional. Although some cases use the term "for a discriminatory purpose," the better term is "intentional," that is, not "caused by mistake, accident, negligence, or another innocent

reason." *Love v. McBride*, 896 F.Supp. 808, 809 (N.D. Ind. 1995).

The failure to accommodate James Rush was not simply negligent medical care. In *Breedlove v. Costner*, 2010 WL 354024 (W.D. Okl. 2010), citing *Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. N.H. 2006), the distinction is clear. The court there held, "[C]ourts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care [emphasis added]." *Id.* at *3 n.16. Clearly although ADA and Rehabilitation Act cases do not apply to medical treatment decisions per se, they do when those decisions are discriminatory and the other conditions of the Acts are met.

## D. **The State Counts**

Plaintiff has pled in the alternative that the failure to treat was a negligent act by non-medical staff to which the Sheriff is liable under state law by virtue of his office. This does not constitute a medical malpractice case because the staff were not trained medical professionals and were not under that duty. Rather the office of the sheriff was under a duty of care to provide care for its arrestees and a special duty for a vulnerable arrestee like Mr. Rush.

### 1. **Negligent undertaking (Count IV)**

Defendants claim that the "negligent undertaking" claim in Count IV is duplicative of the negligence claim in Count V. This is not the case. Count IV is based on the "undertaking doctrine," that although a person may not have a duty to perform a

certain action (e.g. the limitations on police liability under the "public duty doctrine"),

once the action is undertaken, there is a duty to perform the action non-negligently.

The standard of care is the reasonable person standard.

> In *Wallace v. Dean*, the Supreme Court of Florida held that:

> [i]n every situation where a man undertakes to act, or to pursue a particular course, he is under an implied legal obligation or duty to act with reasonable care, to the end that the person or property of others may not be injured by any force which he sets in operation, or by any agent for which he is responsible. If he fails to exercise the degree of caution which the law requires in a particular situation, he is held liable for any damage that results to another, just as if he had bound himself by an obligatory promise to exercise the required degree of care.... [E]ven "where a man interferes gratuitously, he is bound to act in a reasonable and prudent manner according to the circumstances and opportunities of the case."

*Wallace v. Dean*, 3 So. 3d 1035, 1050 (Fla. 2009), *reh'g denied* (Feb. 25, 2009), *citing Banfield v. Addington*, 104 Fla. 661, 140 So. 893, 896 (1932) (citations omitted) (emphasis supplied) (citing 1 Thomas A. Street, *Foundations of Legal Liability* 92 (1906)) (quoting *Flint & Walling Mfg. Co. v. Beckett*, 167 Ind. 491, 79 N.E. 503, 506 (1906)).

In *Wallace v. Dean*, the decedent's daughter called 911 to request that deputies

check on her mother who was not responding the phone or knocks on her door.

Deputies responded and entered the dwelling through the window. They found the

plaintiff's mother breathing but unresponsive to attempts to rouse her. In fact, the

plaintiff's mother was in a diabetic coma but the deputies assured her that her mother

was only sleeping and that there was no need to call an ambulance. Deferring to the

deputies experience, family members did not seek further help. The next day, the

plaintiff's mother was still unresponsive. Family members called an ambulance to take her to the hospital where she died several days later. *Id.* at 1043.

In the current case, the decedent, Mr. Rush, told officers he didn't want to inconvenience members of his family in the middle of the night. He said his elderly brother, who lived nearby, was ill. Thus, Mr. Rush was delighted when the Sheriff's dispatcher told him an officer was coming to check on him. At the same time, in undertaking to check on Mr. Rush, the deputies undertook to do so non-negligently, since their undertaking discouraged Mr. Rush from going on, driven by his desperation, and calling his family members to help him.

The Undertaking Doctrine is a theory of tort liability that is outside the analysis in *Trianon Park Condominium Association v. City of Hialeah*, 468 So.2d 912, 919-21 (Fla.1985). In *Wallace*, the Florida Supreme Court found that in undertaking to conduct a safety check, the deputies owed the decedent a common law duty of care and that in carrying out the program of the 911 system, they were carrying out an operational function. *Wallace* at 1045-46.

### 2. Negligent supervision, training, discipline, or retention (Count V)

To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed plaintiff a duty of care, that the defendant breached that duty, and that the breach caused injury. *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing *Paterson v. Deeb*, 472 So. 2d 1210, 1214 (Fla. 1st DCA 1985)). Under

Florida's Public Duty Doctrine, a plaintiff suing a governmental entity in tort must allege that the defendant owed a duty of care to the plaintiff individually, rather than to the public in general. *Seguine v. City of Miami*, 627 So.2d 14, 16 (Fla. 3d DCA 1993).

One basis of such an individual duty is sometimes referred to as a "special relationship" between law enforcement and an individual. One such recognized "special relationship" exists when law enforcement has the individual in "custody of some sort." *Smith v. City of Plantation*, 19 F.Supp.2d 1323 (1998) citing *Kaisner*, 543 So.2d at 734. Here, Plaintiff's decedent was in Defendant Haddock's custody and Plaintiff has amply alleged a duty in Defendant Haddock to Plaintiff, based on that.

Defendant cites *Tallahassee Furniture, Inc. v. Harrison*, 583 So.2d 744 (Fla. 1st DCA 1991), to the effect that there is only *respondeat superior* when the wrongdoer is at least motivated by a purpose to serve the employer's interest. However in this count, the Plaintiff's state claim against Defendant is not based on *respondeat superior*, but on the Defendant's own negligence.

But there too, *Tallahassee Furniture* can be instructive. In that case, a young woman was raped by a man who had earlier delivered a couch to her home. He subsequently returned to her home on a pretext and she let him in. The employee then stabbed and bludgeoned the young woman. Id. at 748-49. The case went to trial on both theories of negligence and *respondeat superior*. The Florida First District Court of Appeal agreed that there was no *respondeat superior* under the facts but that there was negligence where the

22

employer failed in his duty to investigate the background of the attacker before giving him access to his customers.

The court held that "the ultimate question of liability to be decided is whether it was reasonable for the employer to permit the employee to perform his job in the light of information about him which the employer should have known." Id. at 751.

### 3.  Abuse or neglect of a vulnerable adult (Count VI)

Plaintiff also alleged that the treatment of Mr. Rush constituted abuse or neglect of a vulnerable adult under § 415.1111, Florida Statutes.

Although Mr. Rush had been able to care for himself for some time, driving short distances to shop, keeping house, cooking, and cleaning, on the early morning of January 23, 2008, he was deteriorating, confused, and unsteady. Prior to his being taken into custody, he spoke of fearing that he would be found dead on the floor, of being desperate. The video portraits of Mr. Rush before arrest and at arrival at the jail being helped from the patrol car and ushered into the jail, an officer on each arm, was one of a vulnerable adult. § 415.102(27), Florida Statutes.[3]

As to the other definitions under Chapter 415, Washington County Sheriff's Department employees, in their role as transporters and, Washington County Jail

---

[3] Defendants disingenuously quote the provision in 415.102(5) that, "*For purposes of departmental investigative jurisdiction*, the term caregiver does not include law enforcement officers . . . ." Defendants underline "law enforcement officers" when they should pay more attention for the limited purpose for which law enforcement officers are excluded. The passage simply means the agency that had a duty to investigate abuse and neglect of vulnerable adults did not have that duty with regard to law enforcement officers." Under the rule of construction *expressio unius est exclusio alterius*, law enforcement officers are clearly meant to be included as persons who may be caregivers.

employees, as providers of care and custody to its residents, fit all the essential elements of the term "caregiver." The Jail itself fits the description of a facility providing residential care providing care to persons, including vulnerable adults. § 415.102(5), Florida Statutes.

"Neglect," under § 415.102(16), Florida Statutes, includes "the failure or omission on the part of the caregiver to provide the care, supervision, and services necessary to maintain the physical and mental health of the vulnerable adult, including, but not limited to, food, clothing, medicine, shelter, supervision, and medical services, that a prudent person would consider essential for the well-being of a vulnerable adult." § 415.102, Florida Statutes.

In discussing the application of *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So. 2d 717, 721 (Fla. Dist. Ct. App. 2008), Defendants characteristically blur the import of the decision by failing to state forthrightly that the critical reason the Chapter 415 theory of action was rejected (although the court held on the facts of the case that it failed to state a claim) was that the complaint sought to use Chapter 415 to extend liability under Florida's medical malpractice statute, Chapter 766. Plaintiff's allegations, although they allege a failure to treat, do not allege medical malpractice.

### 4.  The Court should retain jurisdiction

A federal court has discretion to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) is discretionary and may be declined if the district court has dismissed

claims over which it has original jurisdiction. There should be no such basis here. Defendant Haddock's failure to staff and train his patrol and jail divisions to accommodate the health needs of frail and elderly detained persons demonstrated deliberate indifference and negligence.

The Court, having become intimately aware of the facts and circumstances of the case is able to and should continue to exercise jurisdiction to the conclusion of the matter. However if the Court chooses not to exercise that jurisdiction, the terms of its dismissal should clearly state that the dismissal is not on the merits of the state claim.

WHEREFORE, Plaintiff moves this Honorable Court to Deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

s/ James V. Cook
JAMES V. COOK
Florida Bar Number 0966843
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax

Attorney for Jaqueline Finn

I CERTIFY the foregoing was filed electronically on 5/31/2011 and that the person noted below is registered to be notified by the CM/ECF electronic mail system:

Keith Tischler
Jolly & Peterson, P.A.
Post Office Box 37400
Tallahassee, FL 32315

s/ James Cook
JAMES V. COOK

25