UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ESTATE OF JAMES RUSH,

    Plaintiff,

v.

HON. BOBBY HADDOCK, et al.,

    Defendant.

CASE NO. 5:10-cv-152-RS

**PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, JACQUELINE FINN, Personal Representative of the ESTATE OF JAMES RUSH, by and through the undersigned attorney, provides this Statement of Facts in Opposition to Defendants' Motion for Summary Judgment, and would show as follows:

(The transcripts of the calls based on two sequential audio recordings and filed by Defendants as Doc. 26-5 and 26-6 will be referred to as "T1 and T2, followed by a space and the pertinent page numbers.)

1. On January 23, 2008, about 12:45 a.m., James Rush, a 79-year-old man who suffered from Chronic Obstructive Pulmonary Disease (COPD), called Washington County 911, and spoke to the operator in a confused and rambling way, about wanting to have an officer come out and check on him.

1

2. According to the transcript of the calls, Mr. Rush wanted someone to come out "so I could get my head back together because I got an appointment in the morning for my ride, my transportation, and . . ." at this point the 911 operator asks for his address and name. (T1 2).

3. Mr. Rush tells Dep. Rackard, "my transportation is coming tomorrow morning. And I don't want to screw it up because I'm laying on the floor here." He said his ride was supposed to come at 7:30 in the morning. (T1 6). Mr. Rush tells Dep. Rackard that he tried to signal his brother for help: "Because I went out and blew the horn, blew the horn, and I put the lights on in the car. But he – he must be very, very sick because he's not – he's not answering the – my distress call." (T1 6-7).

4. Mr. Rush frequently refers to his confusion, that "I think I got a little confused," (T1 2). He needs a visit "to get me straight a little bit," (T1 3). "I get a little mixed up." (T2 9). "I'm getting a little feeble-minded." (T2 11). When Defendant Rackard calls him he says, "I'm getting all mixed up." (T1 6). When warned he may be arrested if he calls 911, he says, "Oh okay. I'll have to call 911. I don't want to get arrested. So I'll call 911 again." (T2 14).

5. Mr. Rush says "I tried to set up everything in the house in case I fall. That's my big problem. I just don't want to fall on the floor." (T1 3). While on the phone with Dep. Rackard, he says, "I just don't know where to turn; do you

understand what I'm saying? And if -- if it's possible, I don't care if it takes three hours to come out. If -- I don't want to bother you. And if you could come out at your time, your leisure, you know, or call somebody that could help me, you know. I don't want to fall, okay?" (T1 11-12).

6. After several calls, Mr. Rush stopped calling 911 and started calling the Sheriff's Office. The dispatcher says in a call to Dep. Rackard, "he done found the sheriff's office number now." She continues, "He ain't calling 911 no more. He's calling the sheriff's office." (T1 25-26).

7. Mr. Rush alludes to a problem hearing. (T2-2). When Dep. Rackard tells him not to call 911 and Mr. Rush apparently thinks he told him to call 911. At another point, speaking to the 911 operator, he doesn't realize who he's speaking to and says, "if you had hanged up on me, I would have nowhere to go. I don't want to be bothering the 911." (T2 4-5, 8). Later he says, "I called 911, but they're so busy." (T2 11). After being told to go to sleep, he says, "Oh, that's great then. I'll just have to wait until 911 calls me back." (T2 13).

8. Although his conversation touched on a number of subjects, one theme Mr. Rush returned to again and again was not wanting to be found on the floor the next morning or, more specifically, not wanting to be found on the floor dead. He said that his brother was sick and his nephew lived 100 miles away and by the time he got there, "I'd be long gone." (T2 6, 19).

9.  Mr. Rush tells the dispatcher, "I'll just have to sweat it out till – I'll just lay on the couch and then wait for somebody." And "I'm sick, you know. Okay." The dispatcher replies, "All right." (T2 15). Later he says, "Oh God I'm sick. Oh God, help me. I keep holding this phone until somebody comes out. You know, I won't take the phone off the hook, and then I'll make sure that if they can't call me, they'll come out and look and take a peek in at me and see me on the floor. I don't want to be on the floor. (T2 16).

10. Though his conversations with the 911 operator touched on mundane subjects, he sounded troubled and afraid. At one point, Mr. Rush said to the 911 operator, "No wait, no wait. I just want to tell you that before you hang up on me. All right, because I'm getting a little desperate, pretty near desperate." (T2 19). At another point he said, "I don't want to be on the floor here and my brother say – you know, dead or something and he'd say, "Christ, why didn't you call 911?" (T2 19).

11. After numerous such calls, totaling nearly an hour, and two welfare checks by Deputy Rackard, Rackard ordered Mr. Rush to be arrested for misuse of 911. Dep. Rackard did not smell alcohol and said Mr. Rush wasn't staggering. (Deposition of Jonathan Rackard, p. 12, 16, 19). Mr. Rush's speech was not slurred. (Rule 30(b)(6) Deposition of Jonathan Rackard, p. 8). He recalls only

telling Dep. Stone that Mr. Rush had been drinking, not that he was drunk. (Exhibit A, Deposition of Jonathan Rackard, p. 27).

12. James Rush stated, "I thought maybe the policeman would find out it's an emergency and then he wouldn't arrest me, you understand, because I don't want to bother my brother, you know." (T2 24). A few minutes later, Deputy Stone was there to arrest Mr. Rush (T2 28).

13. Dep. Stone arrived at Mr. Rush's home at about 5:54 a.m. On the in-car video camera installed in Dep. Stone's patrol car, Mr. Rush is seen slouching low on his couch, gasping for air. Dep. Stone pulls Mr. Rush off the couch and lets him go just off camera, presumably on the floor. Later Stone returns and puts Mr. Rush back on the couch. (Exhibit B, Dep. Stone's In Car Video Recording).

14. Dep. Stone did not think Mr. Rush was drunk. (Exhibit C, Deposition of Frank Stone, p. 22). He could have issued a notice to appear but felt he was bound to take Mr. Rush to jail because he was ordered to do so by his "commanding officer," Dep. Rackard. (Exhibit C, Deposition of Frank Stone, p. 6). Dep. Stone noticed oxygen tanks in the home and placed one of them, which was attached to tubing and breathing apparatus, into the trunk for the ride to the jail.

15. When Mr. Rush learned that he was to be arrested and taken to jail, he stated, according to Deputy Stone, "No, no . . ." and told Dep. Stone he no longer needed him. Dep. Stone said he had to call for assistance because of Mr. Rush's being "uncooperative." (Exhibit C, Deposition of Frank Stone). Mr. Rush is seen on the in-car video being supported on either side by Dep. Stone and Dep. Smith. (Exhibit B, Dep. Stone's In-Car Video Recording).

16. Mr. Rush was taken to the Washington County Jail where he collapsed and died in a holding cell. Shortly thereafter, the dispatcher received a call as follows:

    UNIDENTIFIED FEMALE SPEAKER: Yes, rna' am. This is Ed Rush and this is Jane Pruitt. We are trying to find his brother, James Rush.

    FEMALE DISPATCHER: Okay. And you are?

    UNIDENTIFIED FEMALE SPEAKER: I am the lady that transports him to the doctor. And I came out to take him to Dr. Hatcher's this morning for an 8:00 appointment. And me and his brother both -Mr. Rush is hunting him all over this place.

    (T2 39).

17. On another line, the dispatcher and another official discuss what they will be able to tell Ms. Pruitt, the woman who was to transport Mr. Rush to the doctor that morning. The dispatcher said, "Well, he's been calling 911 100

times since 1:00 this morning." The second person says, "There may have been a reason. I don't know." The dispatcher replies, "Yeah. Could have been. Don't know." (T2 42).

18. Mr. Rush had no criminal record and had no experience with the machinations of the criminal justice system. All indications are that he was terrified by the process

19. There is some question about the fierceness of Mr. Rush's resistance to arrest. Deputy Smith, who Deputy Stone summoned for assistance, testified that Stone told him he needed help because of Mr. Rush's frail condition. (Deposition of Gary Smith, filed by Defendants as Doc. 28-1, p. 13).

20. As to whether Mr. Rush was intoxicated or seemed to be intoxicated at the time of his arrest, the laboratory tests indicated a .023 alcohol level, less than one-third Florida's threshold of impairment. The Medical Examiner, Dr. Snider, said that would be consistent with having one beer in the preceding few hours and would be a pretty accurate snapshot of Mr. Rush's alcohol level since his body was refrigerated at death and there would have been little change. (Exhibit D, Deposition of Cameron Snider, pp. 78, 84). Deputy Smith smelled no alcohol on his person but thought he might be intoxicated because he seemed happy although he was going to jail. (Deposition of Gary Smith, filed as Doc. 28-1, p. 34).

21. James Rush died of a cardiac event brought on by oxygen starvation or "anoxia." The Medical Examiner, Dr. Cameron Snider, stated there was a "diffuse edema" in the brain caused by a lack of oxygen to the brain. (Exhibit D, Deposition of Cameron Snider, p. 64-68, 72-74). Plaintiff's expert agreed oxygen starvation was the critical factor in the death. (Exhibit E, Expert Report of L.J. Dragovic, M.D.). Mr. Rush stated as he was led from the car that he was short of breath. (Exhibit F, Deposition of Billy Brock, p. 19).

22. Defendants' expert claimed a "diffuse edema" did not necessarily mean oxygen starvation where there had been vigorous efforts to resuscitate a decedent. Though the Defendants' expert did not explain, an inference could be drawn that he meant an edema could be caused by head trauma resulting from the resuscitation process. Medical Examiner Snider made clear there was no evidence of trauma to the head. (Exhibit D, Deposition of Cameron Snider, p. 72-74).

23. The Medical Examiner testified that stress would have aggravated Mr. Rush's condition and his need for oxygen. (Exhibit D, Deposition of Cameron Snider, p. 78-79). The Deputies had placed Mr. Rush's oxygen in the trunk of the patrol car, out of his reach. After their Academy Training, Deputies had no particular medical training, other than CPR. (Deposition of Gary Smith,

filed as Doc. 28-1, p. 32). The Deputies did not take Mr. Rush to a hospital or call medical staff to meet them at the jail.

24. Numerous customs and practices were implicated in Mr. Rush's death:

   a. The Sheriff's Dispatcher, who handled 911 calls, had no particular training to assist her in determining a caller's mental condition. (Exhibit G, Deposition of Jennifer Cate, p. 23). Although Mr. Rush complained that he was desperate and feared being found dead on the floor of his home, the Dispatcher did not alert deputies conducting the welfare checks or going out to arrest him as to his fear of death or the likelihood that he had a health emergency. (Exhibit A, Deposition of Jonathan Rackard, p. 15).

   b. The Sheriff had a policy of undertaking to conduct welfare checks but the officers who conducted the checks had no particular training, other than standard law enforcement training, on which to base decisions about the well-being of the subjects of the checks. (Deposition of Gary Smith, filed as Doc. 28-1, p. 34). Deputy Rackard spoke to Mr. Rush from the doorway. He did not go in the home and did not observe the oxygen tanks or any other indicators of a serious health condition. He saw a glass of beer and noted Mr. Rush's confusion. (Exhibit A, Deposition of Jonathan Rackard, p. 10, 15, 18).

c. When Mr. Rush was brought to the jail in a fragile state of health, no medical assistance was requested although his status had changed from an arrestee to a person committed under the Marchman Act, an involuntary civil commitment based on danger from substance abuse. (Exhibit C, Deposition of Frank Stone), (Exhibit A, Deposition of Jonathan Rackard, p. 25). Jail nurse Hazell testified that there was no policy or training for evaluation by trained medical staff at booking. (Exhibit H, Rule 30(b)(6) Deposition of Judy Hazell, p. 3-4), (Exhibit I, Deposition of Judy Hazell, p. 9). Mr. Rush was hooked up to his oxygen but otherwise virtually abandoned. (Exhibit J, Video of Washington County Jail Booking Area).

d. The booking desk was unmanned during much of Mr. Rush's 25 minutes in the booking area holding cell. The Washington County Jail did not normally have a permanent designated booking officer. Rather, the job was undertaken by an officer who was available for a period of time but who might leave the area to do other tasks with or without a replacement. (Exhibit K, Deposition of Karla Brock, p. 4). Minutes before his death, Mr. Rush is seen on video walking slowly to the holding cell door as if trying to summon assistance. Finding no one, he returns to his bench and collapses a few minutes later. (Exhibit J, Video of Washington County Jail Booking Area).

25. The above policies and practices are causally-related to Mr. Rush's death because he died of oxygen starvation, a state a reasonable jury could ascribe to his having been transported without access to his oxygen in what would have been a stressful trip to jail. When the Jail's sole medical staff person arrived at Mr. Rush's cell, he had no pulse although a weak pulse started up though CPR it was quickly lost and did not recur. There was no heart beat sufficient to trigger the Automated External Defibrillator (AED). (Deposition of Judy Hazell, p. 10-27). Ironically, in the minutes after his collapse, a community health worker was at his home looking for Mr. Rush to take him to his doctor's appointment that morning. (T2 39).

26. The Defendant Sheriff learned of the incident while it was unfolding and intervened to change Mr. Rush's status from an arrestee to a person who was being temporarily involuntarily civilly committed on the basis of a concern that his life was endangered by abuse of alcohol or drugs. However the Sheriff did not arrange for medical staff to be present to evaluate Mr. Rush or request any other special arrangements to be made at the Jail. (Exhibit L, Deposition of Sheriff Bobby Haddock, p. 11, 22-23).

                                                Respectfully submitted,

                                                *s/ James V. Cook*
                                                JAMES V. COOK
                                                Florida Bar Number 0966843
                                                314 West Jefferson Street

>                    Tallahassee, Florida 32301
>                    (850) 222-8080; 561-0836 fax
>
>                    Attorney for Jaqueline Finn

I CERTIFY the foregoing was filed electronically on 5/31/2011 and that the person noted below is registered to be notified by the CM/ECF electronic mail system:

Keith Tischler
Jolly & Peterson, P.A.
Post Office Box 37400
Tallahassee, FL 32315

>                    *s/James Cook*_____
>                    JAMES V. COOK