IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**ESTATE OF JAMES PETER RUSH,
JACQUELINE FINN, as PERSONAL
REPRESENTATIVE,**

    Plaintiff,

vs.                                                    CASE NO. 5:10-cv-152/RS-EMT

**HON. BOBBY HADDOCK, as
Sheriff of Washington County and
Individually, and JONATHAN RACKARD,
and FRANK STONE, individually,**

    Defendants.
_____/

## ORDER

Before me are Defendants Rackard and Stone's Motion for Summary Judgment (Doc. 23), Defendant Haddock's Motion for Summary Judgment (Doc. 22) and Plaintiff's Response in Opposition (Doc. 33).

### I.  Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). In other words, the basic issue before the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether

the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (*citing Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (*citing Anderson*, 477 U.S. at 251).

## II. Background

I must accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). "All reasonable doubts about the facts should be resolved in favor of the non-movant." *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Plaintiff brings this action as the personal representative of James Rush, now deceased. In the early morning hours of January 23, 2008, Mr. Rush called 911 on multiple occasions. Mr. Rush was 79 years old and in poor health. He suffered from

chronic obstructive pulmonary disease ("COPD") and required the use of an oxygen assistance device.

Defendant Jonathan Rackard ("Officer Rackard"), an officer with the Washington County Sherriff's Office, conducted a welfare check on Mr. Rush after Mr. Rush repeatedly called 911. Officer Rackard "scolded [Mr. Rush] for calling 911 and said he would be arrested if he called again." (Doc. 1, p.19). Mr. Rush again called 911 because his phone was set to automatic redial. At this time, Officer Rackard sent Defendant Frank Stone ("Officer Stone"), an officer with the Washington County Sherriff's Office, to arrest Mr. Rush. Officer Stone arrested Mr. Rush and took him to jail rather than to a hospital facility. Mr. Rush suffered a heart attack, brought on by "oxygen starvation," and died shortly after his arrest (Doc 33, p. 17).

## II.   Analysis

**Qualified Immunity**

The doctrine of qualified immunity protects government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) (citation omitted). This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

In *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001), the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified

immunity claims.  First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right.  *Id*.  Second, if the plaintiff satisfied the first step, the court had to determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 129 S. Ct. at 816 (*quoting Saucier,* 533 U.S. at 201, 121 S. Ct. at 2156).

The Supreme Court revisited *Saucier's* mandatory two-step inquiry in *Pearson. Id.,* 129 S. Ct. at 815-18.  The Court held that while the *Saucier* process is often appropriate, "it should no longer be regarded as mandatory."  Rather, "[t]he judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

Applying this two-step analysis, the courts have recognized that "deliberate indifference to serious medical needs" of prisoners or others in custody violates the Constitution.  *Erickson v. Pardus*, 551 U.S. 89, 90, 127 S. Ct. 2197, 2198 (2007) (*citing Estelle v. Gamble*, 429 U.S. 97, 104-105, 97 S. Ct. 285, 292(1976)).  Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.  However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.  *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

To sustain such a claim, Plaintiff must allege facts that satisfy both an objective and a subjective requirement. There must be an "objectively serious deprivation" of medical care, which requires (1) "an objectively serious medical need[1] . . . that, if left unattended, poses a substantial risk of serious harm," and (2) that the state actor's response "was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Granda v. Schulman*, 372 Fed. Appx. 79, 82 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted).

Plaintiff also must allege the state actor's subjective intent to punish by pleading facts that would show that Defendant acted with deliberate indifference. Deliberate indifference is shown by: (1) the actor's "subjective knowledge of a risk of serious harm;" (2) the actor's "disregard of that risk;" and (3) "conduct that is more than mere negligence." Deliberate indifference includes: (1) "grossly inadequate care," (2) "a decision to take an easier but less efficacious course of treatment," and (3) medical care that is "so cursory as to amount to no treatment at all." *Id*. at 82-83.

Turning to the facts of the case, when viewed in the light most favorable to Plaintiff, the complaint fails to allege sufficient facts to show a violation of the *Fourteenth Amendment*. Specifically, Plaintiff has failed to show that Defendants had a "subjective knowledge of a risk of serious harm" and that their conduct was "more than mere negligence."

---

[1] A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Granda*, 327 Fed. Appx. at 82.

The Defendants' first indication that there was a problem came from Mr. Rush's contact with the 911 dispatcher. In Mr. Rush's first call to 911 the following exchange took place:

> Dispatcher: This is 911.
>
> Mr. Rush: Well, I just have a little problem here. I don't know, you know, I like to drink beer, you know, and I – I – I thought I bought two cases, and I only bought one. And I can't find the other case.
>
> Mr. Rush: So is that a problem? You know – I – I just wanted to have somebody come out and, you know, just say hello to me and that so I could get my head back together because I got an appointment in the morning . . .
>
> Dispatcher: And what's your name?
>
> Mr. Rush: James Peter Rush. I've just – I think I got a little confused when I missed—missed my beer (Doc. 25, Attach. 5, p. 2-4).

The dispatcher passed this information on to Officer Rackard[2] and informed him that Mr. Rush was "drunk." *Id*. at 4. Officer Rackard then called Mr. Rush to investigate the situation because he was 45-minutes from Mr. Rush's home. In this conversation Mr. Rush stated that "I'm all right. I just – I just want to have – if somebody could come out for five minutes and talk to me a little bit, and I think I'll be fine." *Id*. at 6. Officer Rackard repeatedly asked Mr. Rush "exactly what problem are you having?" *Id*. at 7. Mr. Rush responded "my problem is that the – the thing is that I thought I had – I don't want to say I'm an alcoholic. But my problem was that they had to – I thought I bought

---

[2] The 911 transcript identifies Deputy "Rackford" however this is a misspelling as the transcript later indicates that this is the individual who visited Mr. Rush's house and participated in the events as described in the complaint. (*See e.g.,* Doc. 25, Attach. 5, p. 27) ("No, It's Rackford [sic] . . . I was just out there a little while ago. I can't come back right now.")

two cases of beer." *Id.* Mr. Rush further stated "I drink a lot of beer. That's – I don't take no heavy stuff, you know, no of –none of anything, just beer. Because I enjoy it. It seems to relax me . . ." Mr. Rush never stated that he needed medical attention. While Plaintiff asserts that the 911 call began as a report of theft (Doc. 1, p. 4), there is no indication of this. Rather, Mr. Rush continued to claim throughout multiple 911 calls that the lost case of beer or a desire to talk was the reason for his call. In one exchange, for example, the 911 dispatcher asked Mr. Rush six times what his emergency was and allowed him to respond each time. Over the course of this short period, Mr. Rush never identified a medical problem but rambled about the telephone company, his brother, and the beer (Doc. 25, Attach. 6, p. 10-16). Although he did mention being "sick," the 911 dispatcher and the Officers were reasonable to attribute that comment to intoxication when viewed in the context of the entire conversation. *Id.* at 16.

   Before the first call ended, Officer Rackard asked whether Mr. Rush was thinking about hurting himself. Mr. Rush responded that he was not. Officer Rackard then told Mr. Rush that he should try to go to sleep. It is in this scenario that Officer Rackard went to Mr. Rush's home. At this point, Officer Rackard was reasonable to believe that this was a call primarily about an intoxicated individual. In actuality, Mr. Rush's symptoms of rambling conversation may have been an indication of oxygen deprivation or some other disorientation. However, because Mr. Rush repeatedly spoke about beer and intoxication, the 911 operator and Sheriff's Officers were reasonable to believe that Mr. Rush was not in peril but rather drunk.

When Officer Rackard arrived at Mr. Rush's home he observed "a full glass of beer and a couple empty containers." (Doc. 33, p. 4). Likewise, Officer Stone also noticed "a large number of discarded beer containers in the trash can." (Doc. 35, Attach. 3, p. 13). This scene, as it appeared to the Officers at the time, would have been consistent with what they likely thought was the situation—an intoxicated individual making harassing calls to 911. The best evidence of Mr. Rush's condition at the time of his arrest appears on the video recorded by Officer Stone's patrol car video system (*See* Doc. 40). The facts in dispute which are depicted in uncontested video are viewed in the light depicted by the video. *Baker v. Moskau*, 335 Fed. Appx. 864, 867 (11th Cir. 2009) (*citing Scott v. Harris*, 550 U.S. 372, 381 (2007)).

On this video, Plaintiff contends that Mr. Rush was "visibly gasping" for air (Doc. 33, p. 3). This is not a complete and wholly accurate account of the video. The video begins with the patrol car arriving at Mr. Rush's house (Doc. 40 at 00:59). It is not until five minutes into the video that Mr. Rush appears when he sits on a couch. *Id*. at 5:16. From this distance, not much is discernable. It appears that Mr. Rush talks to the officer in the house and gestures with both hands. Although Mr. Rush, at times, sits back in the couch, he nevertheless appears animated. *Id*. at 5:16-9:00. He has the strength to move his legs while seated. *Id*. at 11:45.

At twelve minutes into the video, the camera is zoomed so that Mr. Rush is more clearly in focus. *Id*. at 12:45. The video shows that Mr. Rush is, at times, short of breath. His breathing appears to be shallow and frequent. *Id*. at 14:00-14:15. However, his breathing was not so labored and his physical condition not so perilous that he could not

reposition himself with the chair, lean forward and sit at the edge of the chair, gesture with both hands and converse with the officer. *Id.* at 14:15-17:00. At no time in the video does it appear that Mr. Rush was actively using oxygen therapy in the Officers' presence.

During the actual arrest, Mr. Rush required two officers to assist him from the chair. However, Mr. Rush walked to the patrol car with assistance and continued talking. The officers allowed Mr. Rush to pause on the way to the car and did not appear to be hurried or aggressive. During this time, the Officers were in close physical proximity to Mr. Rush. *Id.* at 34:33-36:30.

In retrospect, Mr. Rush's physical symptoms may be signs of impending calamity. However, at the time, there were no unmistakable physical symptoms that were clearly exhibited which would have given the Officers a "subjective knowledge of a risk of serious harm." In addition, the Officers were reasonable in not recognizing an objectively serious medical, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Granda*, 327 Fed. Appx. at 82.

The Officers' actions are all the more reasonable because of the context with which they went to the house. From the very beginning, the Officers believed that they were dealing with an intoxicated individual. The 911 dispatcher made this conclusion and passed it along to Officer Rackard. Mr. Rush continued to talk about "beer" with the 911 operator and Officer Rackard while never mentioning shortness of breath or other health problems while on the telephone with them. These conversations further put the

Officers' mindset towards investigation intoxication rather than health problems. Mr. Rush's frailty, imbalance, and shortness of breath could be explained in the Officers' mind by age and intoxication rather than a serious medical need. Plaintiff's expert, Dr. L.J. Dragovic, is correct to classify Mr. Rush's manner of death as an "accident" that resulted from a "grave misunderstanding that ended up with [Mr. Rush] being deprived of oxygen." His assertion that there was also a "reckless disregard for safety" is not supported. (Doc. 35, Attach. 5).

Plaintiff has not met the burden of showing that the Officers were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the Officers] . . . dr[ew] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The video depiction shows that Mr. Rush's shortness of breath is not so alarming that the "official[s] kn[ew] of and disregard[ed] an excessive risk to [arrestee's] health or safety." *Id*. Officers Rackard and Stone are entitled to qualified immunity.

The evidence concerning Mr. Rush's condition while at the Washington County jail is not much different from the evidence before arrest.[3] The Officers did not alert the jail to "prepare them for the fragile state of Mr. Rush's health and the need for medical care and monitoring" because they were themselves not aware of the likelihood of serious health problems. The fact that Mr. Rush was at the jail no more than twenty-five minutes before he had a heart attack (Doc. 1, p. 2) undercuts Plaintiff's lax supervision argument. Quite simply, twenty-five minutes is not such a significant amount of time that jail personnel could, without first being alerted, determine that Mr. Rush needed medical

---

[3] The video shows Mr. Rush from a distance and does not depict detail. Mr. Rush is capable of walking to his cell with assistance and capable of walking to the door of the cell unaided. (Doc. 27, Clip 1 at 4:11, Clip 5 at 2:50).

attention and close supervision.  In addition, the video of the jail shows that Mr. Rush's cell was in clear view and only a few steps from the jailors' control area.  While no person was specifically assigned to watch him, his cell was situated in this highly trafficked area where he was in plain sight.  Upon finding Mr. Rush on the floor, a jail nurse was alerted and brought to his cell within minutes.  These actions are reasonable and because no jailors are named in this complaint, it is unproductive to speculate about their potential liability.

Because Officers Rackard and Stone are entitled to qualified immunity, and no new or significant video of the jail shows Mr. Rush in a more serious medical state preceding the heart attack, Sheriff Haddock is also entitled to qualified immunity for the official capacity claim.  To the extent that Plaintiff seeks to hold Sheriff Haddock personally liable, Plaintiff has come forth with scant evidence that his policies arise to a level of constitutional deprivation.

**ADA and Rehabilitation Act Claims**

The ADA and Rehabilitation Act claims are considered together because, "cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."  *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000).  The ADA's prohibition of disability discrimination applies to state prisoners.  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 1955 (1998).  However, "the failure to provide adequate medical care is not by itself an ADA violation."  *Scott v. Campbell*, 2009 U.S. Dist. LEXIS 85503 (N.D. Fla. 2009) (*citing Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005)).  See also *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir.

2005) (per curiam) (noting that lawsuits under the Rehabilitation Act or ADA "cannot be based on medical treatment decisions"); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (noting that ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners").

Plaintiff's claims under the ADA and the Rehabilitation Act, thus, cannot be maintained as Plaintiff's claims are essentially for failure to treat.

**Remaining State Law Claims**

Because the claims supported by federal question jurisdiction have been resolved in favor of Defendants, I decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367 (c) (3).

### IV. Conclusion

**IT IS ORDERED**

1. Defendants Motions for Summary Judgment (Docs. 22 & 23) are **GRANTED**.
2. The clerk is directed to enter judgment for Defendants and to close this case.
3. Count I: Failure to Treat in Violation of the *Fourteenth Amendment* is dismissed with prejudice.
4. Count II: Violation of §504 of the Rehabilitation Act of 1973 is dismissed with prejudice.
5. Count III: Violation of the ADA is dismissed with prejudice.
6. Counts IV, V, and VI: Negligence Claims are dismissed without prejudice.

**ORDERED** on June 6, 2011.

                                      <u>/S/ Richard Smoak</u>
                                      **RICHARD SMOAK**
                                      **UNITED STATES DISTRICT JUDGE**